IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

M.B., *by and through his father and next friend, Michael Brown,*

          **Plaintiff,**

**v.**

                                            Civil Action No. 3:16cv334

**JEFFREY W. MCGEE,** *in his official capacity as Director of Maggie L. Walker Governor's School, et al.,*

          **Defendants.**

## MEMORANDUM OPINION

This matter comes before the Court on a Motion to Dismiss for "failure to state a claim upon which relief can be granted" filed pursuant to Federal Rule of Civil Procedure 12(b)(6) by Defendants Jeffrey W. McGee, Director of Maggie L. Walker Governor's School, and Philip B. Tharp, Assistant Director of Maggie L. Walker Governor's School (the "Defendants"). (ECF No. 4.) Plaintiff M.B., a minor,[1] by and through his father and next friend, Michael Brown ("M.B.") responded, and the Defendants replied. (ECF Nos. 8, 9.) This matter is ripe for disposition. The Court dispenses with oral argument because the materials before it adequately

---

[1] In accordance with Federal Rule of Civil Procedure 5.2(a)(3), both parties properly refer to Plaintiff, a minor, by initials only. Fed. R. Civ. P. 5.2(a)(3) ("Unless the court orders otherwise, in an electronic or paper filing with the court that contains . . . the name of an individual known to be a minor, . . . a party or nonparty making the filing may include only: . . . the minor's initials . . . .").

present the facts and legal contentions, and argument would not aid the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.[2]

## I. Standard of Review

### A.   Federal Rule of Civil Procedure 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Martin*, 980 F.2d at 952. This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

The Federal Rules of Civil Procedure "require[ ] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (omission in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Plaintiffs cannot satisfy this standard with complaints containing only "labels and conclusions"

---

[2] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. M.B. brings his Complaint under 42 U.S.C. § 1983 and alleges violations of his First and Fourteenth Amendment rights. Section 1983 provides a private right of action for a violation of constitutional rights by persons acting under the color of state law. 42 U.S.C. § 1983.

or a "formulaic recitation of the elements of a cause of action." *Id.* (citations omitted). Instead, a plaintiff must assert facts that rise above speculation and conceivability to those that "show" a claim that is "plausible on its face." *Iqbal*, 556 U.S. at 678–79 (citing *Twombly*, 550 U.S. at 570; Fed. R. Civ. P. 8(a)(2)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

### B.   **Effect of Extrinsic Documents**

"If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998); *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985). However, "a court may consider official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint [without converting a Rule 12(b)(6) motion into one for summary judgment] so long as the authenticity of these documents is not disputed." *Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396–97 (4th Cir. 2006) (citing *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); *Gasner v. Cty. of Dinwiddie*, 162 F.R.D. 280, 282 (E.D. Va. 1995)). "[I]n the event of conflict between the bare allegations of the complaint and any attached exhibit . . . , the exhibit prevails." *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991). Also, "[w]hen matters outside the pleadings are presented in a *response* to a 12(b)(6) motion, a district court has discretion to exclude the additional material."

*Lawson v. Miles*, No. 1:11cv949, 2012 WL 3242349, at *4 (E.D. Va. Aug. 6, 2012) (emphasis added) (citations omitted).

C.    **Extrinsic Documents Before the Court**

M.B. attached to his Complaint "Exhibit 1," the February 22, 2016 email he sent to the Harvard University Admission's Office (the "Harvard Admission's Office). (ECF No. 1-1.) The Defendants attached to their Motion to Dismiss "Exhibit A," a full copy of the Maggie L. Walker Governor's School ("MWGS") Handbook. (ECF No. 5-1.) M.B. attached to his Response to the Motion to Dismiss five exhibits: (1) a March 11, 2016 letter from McGee to M.B.'s parents giving notice of M.B.'s disciplinary infraction; (ECF No. 8-1), (2) screenshots of the Common Application questions relating to an applicant's disciplinary history; (ECF No. 8-2), (3) a March 15, 2016 letter from M.B.'s attorney to McGee regarding M.B.'s appeal of the disciplinary action; (ECF No. 8-3), (4) a March 24, 2016 letter from McGee to M.B.'s attorney in response to the March 15, 2016 letter; (ECF No. 8-4),and, (5) an April 22, 2016 letter from McGee to M.B.'s parents stating McGee's decision to uphold the disciplinary sanction imposed on M.B, (ECF No. 8-5).

The Court will consider only three of the proffered exhibits: (1) the February 22, 2016 email from M.B. to the Harvard Admission's office; (2) the MWGS Handbook; and, (3) the March 11, 2016 letter from McGee to M.B.'s parents. M.B. sufficiently refers to those three exhibits in his Complaint, they are central to M.B.'s claims, and neither party disputes their authenticity. *See Witthohn*, 164 F. App'x at 396–97 (citations omitted). The Court, however, will not consider the four remaining exhibits: (1) the screenshots of the Common Application questions; (2) the March 15, 2016 letter from M.B.'s attorney to McGee; (3) the March 24, 2016 letter from McGee to M.B.'s attorney; and, (4) the April 22, 2016 letter from McGee to M.B.'s

4

parents.  Although he seeks to append them now, M.B. did not refer to those four documents in

his Complaint, and they are not central to his claim.[3]  The Court will exercise its discretion and

decline to consider those documents.  *See Lawson*, 2012 WL 3242349, at *4.

## II.  Procedural and Factual Background

### A.      Procedural History

M.B. alleges three counts in the Complaint, each against both Defendants in their official

capacities.

> Count I:   "Due Process – Lack of Notice."  In violation of M.B.'s Fourteenth
> Amendment[4] rights, "the Defendants are depriving him of liberty without due
> process of law" because "[t]he 'bullying' standard as applied to the facts of
> this case is unduly vague."  (Compl. ¶¶ 48, 47.)

---

[3] M.B. refers to the latter four documents when seeking to refute aspects of Defendants'
Motion to Dismiss.  For instance, M.B. discusses the screenshots of the Common Application
when attempting to refute Defendants' factual assertions that MWGS and its staff do not provide
any disciplinary records to colleges.  At this stage, however, the Court assumes that colleges
received M.B.'s disciplinary record.

Neither party can dispute or raise new facts as part of Rule 12(b)(6) briefing.  In ruling on
a motion to dismiss for failure to state a claim, the Court "does not resolve contests surrounding
the facts, the merits of a claim, or the applicability of defenses."  *Martin*, 980 F.2d at 952.
Rather, the Court takes as true M.B.'s well-pleaded allegations and views those allegations in the
light most favorable to M.B.  *See id.*  Thus, for purposes of this motion, the Court presumes, as
M.B. alleges, that "there is every likelihood (and, indeed, it is [MWGS's] intention) that college
admissions personnel . . . will see the damaging information."  (Compl. ¶ 45.)

M.B. attaches the other three letters (March 15, March 24, and April 22, 2016), it seems,
to argue the merits of whether his conduct satisfies the definition of bullying used by MWGS.
(*See* Pl.'s Resp. 16, ECF No. 8.)  For reasons explained more precisely later, *see infra* Part III.B.,
M.B. improperly tackles the merits of the claim before asserting a claim he can pursue.  As such,
the Court cannot address this aspect of his briefing.

[4] The Fourteenth Amendment to the United States Constitution provides, in part:

> No State shall make or enforce any law which shall abridge the privileges or
> immunities of citizens of the United States; nor shall any State deprive any person
> of life, liberty, or property, without due process of law; nor deny to any person
> within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV.

Count II:   "Due Process – Arbitrary and Capricious Action."  In violation of M.B.'s
Fourteenth Amendment rights, the Defendants are "seeking to rewrite the
Standards for Student Conduct retroactively to punish M.B. for conduct which
they dislike, but which was not prohibited at the time." (Compl. ¶ 51.)

Count III:   "Free Speech."  In violation of M.B.'s First Amendment[5] rights, the
Defendants punished M.B. for his speech. (Compl. at 10.)

M.B. seeks:  (1) an injunction prohibiting the Defendants from reporting that M.B.

committed bullying and requiring the Defendants to expunge any reference to this incident from

his record; (2) nominal damages; and, (3) costs and attorneys' fees.

The Defendants have moved to dismiss all counts of the Complaint.  The Defendants

assert that Count I, the Void for Vagueness claim, and Count II, the Arbitrary and Capricious

claim, must be dismissed because M.B. fails to allege a constitutionally protected interest on

which a claim for a Due Process violation may be based.  The Defendants further argue that

Count I, the Void for Vagueness claim, should be dismissed because M.B. had adequate notice

that MWGS prohibited his conduct; and Count II, the Arbitrary and Capricious claim, should be

dismissed because the Defendants had a rational basis for their decision to punish M.B. for

bullying.  Finally, the Defendants aver that Count III, the Free Speech claim, should be

dismissed because "it was reasonably foreseeable that [M.B.'s] email would reach the school and

his email threatened to—and did—cause a material and substantial disruption to the operation of

---

[5] The First Amendment to the United States Constitution provides in full:

Congress shall make no law respecting an establishment of religion, or prohibiting
the free exercise thereof; or abridging the freedom of speech, or of the press; or
the right of the people peaceably to assemble, and to petition the Government for
a redress of grievances.

U.S. Const. amend. I.

MWGS and collided with the rights of others." (Mem. Supp. 10–11.) M.B. has responded to the Motion to Dismiss, (ECF No. 8), and the Defendants have replied, (ECF No. 9).

## B.    Summary of Allegations in the Complaint[6]

### 1.    Alleged Facts

M.B.'s Complaint conveys a relatively straightforward series of events. M.B., then a junior at MWGS, "a prestigious public high school" located in Richmond, Virginia, (Compl. ¶ 13), learned in the Spring of 2016, that R.P., another student at MWGS, had been admitted to and received a financial scholarship from Harvard University. M.B. "was aware that R.P. had been caught and disciplined for cheating" by MWGS, and believed that MWGS administration had either deleted this incident from R.P.'s school records or failed to disclose it during the application process. (*Id.* ¶ 20.) Believing that MWGS's honor code required him to report this information, M.B. sent an email to the Harvard Admission's Office from his home computer on February 22, 2016, at 10:28 a.m.[7] (Ex. 2.) Because the parties' dispute originates from the email, the Court reproduces it in full:

To Harvard admissions officers . . .

I am a concerned student attending [MWGS]. A controversy has arisen recently regaurding [sic] an admitted applicant to you [sic] college, a one [R.P.]

---

[6] For purposes of the Motion, the Court will assume the well-pleaded factual allegations in the Complaint to be true and will view them in the light most favorable to M.B. *Matkari*, 7 F.3d at 1134.

[7] The Complaint states that M.B. sent the email "after school hours, on or around February 17, 2016," (a Wednesday), (Compl. ¶ 21), but the copy of the email M.B. attaches to his Complaint indicates a "Sent" date and time of February 22, 2016, (a Monday) at 10:28 a.m. (Ex. 2). M.B. does not allege—plausibly or otherwise—why he would not be in school on that Monday at 10:28 a.m. M.B. suggests no illness or school holiday; indeed he entirely fails to address the time and date discrepancy. However, the Court need not address any implications of M.B.'s inconsistent record for purposes of this decision, and simply observes that the date in the exhibit prevails. *See Fayetteville Inv'rs*, 936 F.2d at 1465 ("[I]n the event of conflict between the bare allegations of the complaint and any attached exhibit . . . , the exhibit prevails.").

Recently, this student has recieved [sic] a scholarship funding surmounting [sic] to a large sum of money. However, in order to qualify for this scholarshsip, [R.P.] would need to have no honor code violations on [R.P.'s] record. This was not the case.

Members of administration of [MWGS] deleted numerous accounts of honor code violations, to include instances of cheating on tests. The result, it seems, is that [R.P.] has gotten away with numerous instances of cheating and fraud; which [R.P.] has been known for doing often.

With this blemish removed from [R.P.'s] record, [R.P.] has been admitted into your presitgious [sic] university under falsified pretense [sic]. If not clear, the administration of my high school has done this to enhance college acceptance and scholarship numbers. These numbers are boasted by the school, as this high school is one of the greatest schools for college acceptance [sic].

While I am not denying the intensity of this school, the case of [R.P.] is of great concern to myself as a student, who values sincerity in education. I find the faults of [R.P.] and especially that of the school administration to be quite disturbing, thus I have notified you accordingly.

The [School] Honor Code is as follows:

> The . . . Honor Code ensures that students do not lie, cheat, or commit plagiarism, not [sic] tolerate those who do. The [School's] student-led Honor Council endeavors to uphold the Honor Code and to promote a trusting, collegial atmosphere between students and faculty.
> At [MWGS] our philosophy on honor is simple: achievement based on fraud will crumble, but true scholarship and love of learning will endure for life. An honorable mindset does not end at graduation, for our honor system builds an ethos of honor that lasts long after students depart [MWGS] in cap and gown.

The School Profile is linked <u>here</u> [hyperlink included]

for [sic] validation or more information, feel free to contact
    Jeff McGee, Director at [email address]
    Phil Tharp, Assistant Director at [email address]

My name is [M.B.], a junior at [MWGS], and I am simply a student obliged to uphold a certain degree of honor.

(Ex. 2–3.) M.B. never shared the email with any other student, nor did he express his concerns

about R.P. over any form of social media. R.P. did not learn of the email until after M.B. "was

called before the administration to determine whether he should be punished for sending it."

(Compl. ¶ 36.)

After receiving M.B.'s email, the Harvard Admission's Office contacted the MWGS

guidance counselor responsible for R.P.'s application. McGee and Tharp received a forwarded

copy of the email from Harvard, and on February 23, 2016, they called M.B. and his parents to

McGee's office to talk about the email. On March 11, 2016, McGee sent M.B.'s parents a letter,

saying that he had found M.B. in violation of MWGS's prohibition on bullying.[8] On April 22,

2016, McGee held an "administrative 'appeal hearing.'" (*Id.* ¶ 41.) During the hearing, M.B.

told McGee that when he sent the email, he "was not directing any action against R.P., but rather

upholding what he believed was his duty under the Honor Code," and that his conduct did not

constitute "bullying," as defined in the MWGS Handbook. (*Id.*) McGee upheld his original

decision finding M.B. in violation of MWGS's prohibition on bullying. M.B.'s punishment

consisted of: (1) performing six hours of work detail; (2) writing a statement about what he

learned about the experience; and, (3) a "permanent[] mark[] [on] his school file so as to show

that he was found guilty of 'bullying.'" (*Id.* ¶ 40.) M.B.'s "derogatory record [of bullying will

be] provided to any college to which M.B. will apply next year." (*Id.*)

---

[8] M.B.'s Complaint includes a footnote saying that "[f]ollowing student outcry about the administration's handling of the cheating incident, McGee announced that the Honor Council was being suspended indefinitely and the administration would handle all student discipline issues without input from the Honor Council. The disciplinary proceedings against M.B. thus were handled exclusively by McGee and Tharp, without input from other stakeholders." (Compl. at 6, n.3.)

M.B.'s statement lacks clarity as to what constitutes the "the cheating incident," meaning the Court cannot discern the timeframe surrounding that incident. While he avers that McGee suspended the Honor Council after "the cheating incident" M.B. does not specify whether the "student outcry" occurred after R.P.'s initial discipline for cheating or after the school community became aware of M.B.'s accusation that MWGS administration concealed R.P.'s honor code violations. Other than this vague footnote, M.B. makes no plausible assertions that anyone other than MWGS administrators and R.P. became aware of the events surrounding M.B.'s email to Harvard, or any circumstances preceding it.

McGee and Tharp told M.B. that his behavior constituted bullying "because the definition of 'bullying' in the Student Handbook includes a number of 'examples' of bullying, one of which is 'falsifying statements about other persons.'" (Compl. ¶ 37 (quoting *Maggie L. Walker Governor's School Handbook and Code of Conduct* ("Student Handbook") 56 (2015–2016).) According to McGee, M.B.'s email to Harvard was false because M.B. stated that R.P. had been punished for cheating numerous times, but R.P. had only been "caught and convicted of cheating *once*" at MWGS. (*Id.* ¶ 38.)

M.B. states that "there was no aggression on [his] part," and that he did not send the email intending to "'harm, intimidate[,] or humiliate' R.P.[, but merely] to carry out M.B.'s reporting obligations under the Honor Code." (Compl. ¶¶ 33–34 (quoting Student Handbook 56).) M.B. claims that "he reported the facts, as he understood them, quietly and discreetly, fully identifying himself and giving the university the means to quickly confirm the information he was reporting." (*Id.* ¶ 4.) In part because of his innocent intentions, M.B. asserts that his action in sending the email did not constitute bullying as defined by MWGS's Student Handbook.

M.B. alleges that the Defendants' actions will cause him reputational injury and will "distinctly alter his legal status by formally marking him as a 'bully,' thereby jeopardizing his ability to obtain admission to the college of his choice" because "college admissions personnel or members of the public will [likely] see the damaging information." (*Id.* ¶ 45.)

### 2.    Student Handbook Provisions

Three sections of MWGS's Student Handbook pertain to this Complaint:  (1) the Honor Code; (2) the prohibition against bullying; and, (3) the definition of bullying.

## a.   The Honor Code

Other than the section governing all aspects of student conduct (the "Standards for Student Conduct" section), the Honor Code is the longest section of the Student Handbook, spanning nine pages.  The Honor Code consists of nine articles and thirteen amendments, containing detailed provisions for what constitutes an Honor Code violation, how MWGS adjudicates alleged violations, and the consequences of a conviction for violating the Honor Code.

The Honor Code "provides that students do not lie, cheat, or commit plagiarism, nor tolerate those who do." (Student Handbook 17.)  To foster freedom, trust, and responsibility, the Honor Code "delegates to the individual students responsibility for integrity in their academic behavior." (*Id.* at 18.)  Students have responsibility to, *inter alia*, "[r]eport any violations of the Honor Code.  If a student witnesses or realizes that a violation of the Honor Code has occurred, the student must report the offense to the instructor involved." (*Id.*)  Cheating, plagiarism, lying, and forgery all constitute violations of the Honor Code.

## b.   The Prohibition Against Bullying

"Section D:  Threats to Persons" of the Student Handbook contains the prohibition on bullying.  That prohibition states in full:

> Bullying, either individually or as part of a group, no student shall harass other students. Repeated or single incidents of negative behaviors targeting a specific victim. The following conduct is illustrative of bulling [sic]:  Physical intimidation, taunting, name calling, and insults. Comments regarding the race, gender, religion, physical abilities or characteristics of associates of the targeted person. Falsifying statements about other persons [sic].

*Id.* at 40.

### c.    The Definition of Bullying

"Section P:  Definitions & Policy Clarifications" of the Student Handbook defines

bullying.  That definition states in full:

> **Bullying** –Note the updated definition of bullying in Virginia Code § 22.1-
> 276.01:  *"Bullying" means any aggressive and unwanted behavior that is
> intended to harm, intimidate, or humiliate the victim; involves a real or perceived
> power imbalance between the aggressor or aggressors and victim; and is
> repeated over time or causes severe emotional trauma.  "Bullying" includes
> cyber bullying.  "Bullying" does not include ordinary teasing, horseplay,
> argument, or peer conflict.*  Examples are:
>
> - Punching, shoving and other acts that hurt people physically
> - Spreading bad rumors about people
> - Keeping certain people out of a "group"
> - Teasing people in a mean way
> - Getting certain people to "gang up" on others
> - Comments regarding the race, gender, religion, physical abilities[,] or
>   characteristics of associates of the targeted person[]
> - Falsifying statements about other persons.

*Id.* at 56.

### III. M.B. Fails to Plead Facts that, if True, Establish a Void for Vagueness Claim

M.B. labels Count I a "Void for Vagueness" claim,[9] but the Court cannot address the

merits of this allegation (whether the MWGS Student Handbook defined bullying clearly enough

for M.B. to be on notice that his conduct was prohibited) because M.B. alleges no

---

[9] M.B. alleges that the description of bullying MWGS utilized is "so vague, as applied in
this case, as not to give clear notice that [it] reach[es] the speech at issue." (Compl. ¶ 46.)  M.B.
contends that McGee and Tharp, at first quoting Section P of the Handbook, "told M.B. that he
was being punished because the definition of 'bullying' in the Student Handbook includes a
number of 'examples' of bullying, one of which is 'falsifying statements about other persons.'"
(Compl. ¶ 37.)  M.B. suggests that McGee and Tharp only referred to Section D of the
Handbook—which talks about "[r]epeated or single incidents"—*after* M.B. filed this Complaint.
   Were this Court able to address M.B.'s vagueness challenge to the admittedly choppy
provisions of Section D relative to Section P, it would have to do so in the context of the facts
alleged:  that, at the time of these events, the Handbook contained both Sections D and P.  But
M.B. fails to establish the deprivation of a protected right that must undergird any Due Process
claim, so the Court cannot weigh the merits of his Void for Vagueness claim.

constitutionally protected interest of which Defendants deprived him.  As a result, this Court cannot reach the due process violation that M.B. contends flows from a lack of notice.  The Court will grant Defendants' Motion to Dismiss Count I, the Void for Vagueness claim.

### A.    Void for Vagueness Challenges Under the Due Process Clause

In order to state a viable claim under 42 U.S.C. § 1983, a plaintiff must allege that a person acting under color of state law deprived him or her of a constitutional right or of a right conferred by a law of the United States.  *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 658 (4th Cir. 1998) (citing 42 U.S.C. § 1983).  M.B. brings Count I, the Void for Vagueness claim, under the Due Process Clause of the Fourteenth Amendment.  The Due Process Clause requires some degree of specificity in drafting legislation and administrative regulations.  *See, e.g.*, *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (striking down a loyalty oath requirement for teachers on vagueness grounds because "[t]he range of activities which are or might be deemed inconsistent with the required promise is very wide indeed").  "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012) (citing *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).  A conviction or punishment runs afoul of the Due Process Clause if the statute or regulation under which it is obtained "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008); *see also Fox*, 132 S. Ct. 2307, 2317 (2012).

> The void for vagueness doctrine addresses at least two connected but discrete due process concerns:  first, that regulated parties should know what is required of

13

them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way.

*Fox*, 132 S. Ct. at 2317 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)).

"Where inherently vague statutory language permits . . . selective law enforcement, there is a denial of due process." *Smith v. Goguen*, 415 U.S. 566, 576 (1974).

### 1.   Legal Standard:  Vagueness and the First Amendment

In the First Amendment context, the vagueness doctrine applies with special exactitude because of the chilling effect vague laws may have on protected expression. *See, e.g., Goguen*, 415 U.S. at 573 ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts."); *see also Baggett*, 377 U.S. at 372 ("Those with a conscientious regard for what [is prohibited] avoid the risk of loss of employment, and perhaps profession, only by restricting their conduct to that which is unquestionably safe.  Free speech may not be so inhibited.").

### 2.   Legal Standard:  Vagueness and School Administration

Vagueness standards apply less rigidly in the school context, however, given that "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and . . . the value of preserving the informality of the student-teacher relationship." *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985).  School rules and regulations must be sufficiently clear and specific that a reasonable person would understand what is prohibited or expected. *See, e.g., Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967) (holding administrative statutes governing state university system unconstitutional on vagueness grounds).  But ultimately, "[g]iven the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the

14

school disciplinary rules need not be as detailed as a criminal code which imposes criminal

sanctions." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986).

### B.  M.B. Cannot State a Claim for a Due Process Violation Because He Alleges No Deprivation of a Constitutionally Protected Liberty or Property Interest

Because the vagueness doctrine amounts to a due process challenge based on lack of

notice, a court may not reach the merits of a plaintiff's void for vagueness claim unless the

plaintiff first shows that state action deprived him or her of "a constitutionally protected liberty

or property interest." *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988)

(citing *Bd. of Regents v. Roth*, 408 U.S. 564 (1972)).  M.B. alleges no deprivation of a protected

property interest.[10]  Thus, in order to state a due process void for vagueness claim, M.B. must

allege that Defendants deprived him of a constitutionally protected liberty interest.  He fails to do

so.

### 1.  Legal Standard:  Deprivation of Liberty Interest

M.B. cannot establish deprivation of a liberty interest because he identifies no alteration

in legal status or deprivation of a property interest, and thus cannot satisfy the "stigma-plus"

standard of *Paul v. Davis*, 424 U.S. 693 (1976).  The Constitution is not "a font of tort law," and

"no constitutional doctrine convert[s] every defamation by a public official into a deprivation of

---

[10] A student in public, state-mandated secondary school has a property interest in
continued enrollment in public, state-mandated secondary school. *See Goss v. Lopez*, 419 U.S.
565, 573–74 (1975). A property interest protected by procedural due process must be "a
legitimate claim of entitlement" created not by federal law, but by "existing rules or
understandings that stem from an independent source such as state law." *Davis v. George Mason
Univ.*, 395 F. Supp. 2d 331, 336 (E.D. Va. 2005) (citing *Roth*, 408 U.S. at 569), *aff'd*, 193 F.
App'x 248 (4th Cir. 2006). Thus, a property interest in a public education clearly exists when a
state mandates a free education because, in that situation, the students "plainly [have] legitimate
claims of entitlement to a public education." *Goss v. Lopez*, 419 U.S. 565, 573–74 (1975).
  However, a school deprives a student of his or her property interest in public education
only when the school effectuates a "total exclusion from the educational process." *Id.* at 576.
Where, as here, a student like M.B. alleges no suspension, expulsion, or exclusion from the state-
mandated secondary school process, no deprivation of a protected property interest has occurred.

liberty within the meaning of the Due Process Clause . . . ." *Id.* at 701–02.  Although a liberty

interest exists "[w]here a person's good name, reputation, honor, or integrity is at stake because

of what the government is doing to him [or her]," *Wisconsin v. Constantineau*, 400 U.S. 433, 437

(1971), courts have clarified that "an injury to reputation alone does not deprive an individual of

a constitutionally protected liberty interest," *Tigrett*, 290 F.3d at 628 (citing *Siegert v. Gilley*, 500

U.S. 226, 233 (1991)); *accord Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 314–15 (4th

Cir. 2012).  Actions do not implicate the Due Process Clause without the "alteration of [a] legal

status[11] which, combined with the injury resulting from the defamation, justifie[s] the

invocation of procedural safeguards." *Paul*, 424 U.S. at 708–09.  Courts refer to this standard as

"stigma-plus." *See, e.g.*, *Evans v. Chalmers*, 703 F.3d 636, 654 (4th Cir. 2012) ("[A] plaintiff

bringing a 'stigma-plus' claim under *Paul* must allege both a stigmatic statement and a state

action that distinctly altered or extinguished his [or her] legal status." (internal quotation marks

omitted)).

    In the school context, without some impact on a student's enrollment, the management of

a student's behavioral issues cannot implicate a protected liberty interest. *See Smith v. Davis*,

507 F. App'x 359, 362 (5th Cir. 2013) ("[A] student who is not denied access to public education

does not have a property or liberty interest implicated."); *Nigro v. Va. Commonwealth Univ.*

*Med. Coll. of Va*, No. 5:09cv64, 2010 WL 2262539, at *7 (W.D. Va. June 4, 2010) ("Where, as

here, there is no property interest nor stigma or impairment of reputation, such that [plaintiff]

could pursue her academic or career objectives elsewhere, no infringement of a constitutionally

protected liberty interest exists."), *aff'd sub nom. Nigro v. Va. Commonwealth Univ./Med. Coll.*

*of Va.*, 492 F. App'x 347 (4th Cir. 2012).  But when coupled with the deprivation of a specific

---

[11] The Court in *Paul* identified "loss of tax exemption or loss of government
employment" as two possible examples of alteration of a legal status.  424 U.S. at 705.

property right, disciplinary charges against students that could "seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment" implicate the Due Process Clause. *Goss*, 419 U.S. at 575; *see also Doe v. Alger*, 175 F. Supp. 3d 646, 658–60 (E.D. Va. 2016) (discussing situations in which a liberty interest can be implicated and noting that "if there is stigma, then the court must also determine whether there is also . . . a legal right or status that was altered or extinguished.").

In briefing, M.B. turns to language used by the Supreme Court of the United States in due process decisions from the 1970s to contend that damage to his "integrity, reputation, honor[,] and good name," coupled with harm to his "educational and vocational future," sufficiently allege the deprivation of a protected liberty interest. (Pl.'s Resp. 10.) In *Wisconsin v. Constantineau*,[12] the Supreme Court broadly stated that a liberty interest exists "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him [or her]." 400 U.S. at 437. Similarly, in *Board of Regents of State Colleges v. Roth*,[13] the Court suggested that if a State "imposed on [a plaintiff] a stigma or other disability that foreclosed his [or her] freedom to take advantage of other employment opportunities," this might implicate a liberty interest. *Roth*, 408 U.S. at 573. Finally, in *Goss v. Lopez*,[14] the Court

---

[12] The aggrieved appellee in *Constantineau* challenged the constitutionality of a Wisconsin statute authorizing designated state officials to "in writing forbid the sale or gift of intoxicating liquors to one who 'by excessive drinking' produces described conditions or exhibits specified traits, such as exposing himself [or herself] or family 'to want' or becoming 'dangerous to the peace' of the community." 400 U.S. at 434 (quoting statute). Constantineau's name was posted "in all retail liquor outlets," and she was prohibited from buying or receiving liquor for one year. *Id.* at 435.

[13] The aggrieved respondent in *Roth* was a non-tenured professor at a state university challenging the university's decision not to rehire him. 408 U.S. 564.

[14] *Goss* involved a class action challenging an Ohio statute that allowed public school officials to suspend students for misconduct for up to ten days without a hearing. 419 U.S. 565.

17

found that the plaintiffs had suffered a liberty deprivation because the charges of misconduct, "[i]f sustained and recorded, . . . could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." 419 U.S. at 575.

However, the Supreme Court has continued to address the liberty interest doctrine since these cases. Indeed, the Supreme Court began refining its analysis as early as 1976 in *Paul v. Davis*, in which it "explained and clarified . . . earlier rulings, seemingly narrowing the circumstances in which the government's damage to a person's name gives rise to a protected liberty interest." *Alger*, 175 F. Supp. 3d at 659 (citing *Paul*, 424 U.S. 693). In *Paul v. Davis*, the Supreme Court considered a due process challenge by the respondent, Edgar Paul, whose name and photograph were included on a flyer of "active shoplifters," which was distributed to local merchants. *Paul*, 424 U.S. at 695. Although Paul had previously been charged with shoplifting, that charge was dismissed "[s]hortly after circulation of the flyer." *Id.* at 696. Paul asserted that the false designation "would seriously impair his future employment opportunities." *Id.* at 697.

The Court rejected Paul's due process challenge, stating that "no constitutional doctrine convert[s] every defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause." *Id.* at 702. Paul's due process claim failed because he could not "assert denial of any right vouchsafed to him by the State and thereby protected under the Fourteenth Amendment." *Id.* at 712. Because of that, the "defamatory publications, however seriously they may have harmed [Paul's] reputation, did not deprive him of any 'liberty' or 'property' interest protected by the Due Process Clause." *Id.*

The *Paul* Court clarified that its previous line of due process cases "does not establish the proposition that reputation alone, apart from some more tangible interests such as employment,

18

is either 'liberty' or 'property' by itself sufficient to invoke the" Due Process Clause. *Id.* at 701.

In *Constantineau*, *Roth*, and *Goss*,

> as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished. It was this alteration, officially removing the interest from the recognition and protection previously afforded by the State, which we found sufficient to invoke the procedural guarantees contained in the Due Process Clause . . . .

*Id.* at 711.[15] Because Paul could identify no alteration in his legal status caused by his name and picture being on the flyer of "active shoplifters," he could state no deprivation of a liberty interest. *Id.* at 712.

M.B.'s allegations here bear similarity to those articulated in *Paul*. M.B. alleges a reputational injury coupled with prejudice to "his ability to be accepted" at colleges to which he applies, (Compl. ¶ 42), or to "obtain admission to the college of his choice," (Compl. ¶ 45). As discussed below, M.B., like Paul, fails to allege facts that establish the deprivation of a constitutionally protected liberty interest.

> ### 2. M.B. Cannot Establish the Alteration of a Legal Status or Deprivation of a Specific Property Right Because, Under the United States Constitution, He Has No Property Right to a College Education

Even assuming that Defendants damaged M.B.'s reputation by "formally marking him as a 'bully,'" (Compl. ¶ 45), M.B. alleges the alteration of no legal status or deprivation of a

---

[15] *Paul* concluded that each case involved *both* reputational harm *and* some other injury. In *Constantineau*, 400 U.S. 433, state action had "deprived Constantineau of a right previously held under state law . . . to purchase or obtain liquor in common with the rest of the citizenry." *Paul*, 424 U.S. at 708. In *Roth*, 408 U.S. 564, "it was not thought sufficient to establish a claim under § 1983 and the Fourteenth Amendment that there simply be defamation by a state official; the defamation had to occur in the course of the termination of employment." *Paul*, 424 U.S. at 710. And in *Goss*, 419 U.S. 565, state "law conferred a right upon all children to attend school, and . . . the act of the school officials suspending the students [without a hearing] resulted in a denial or deprivation of that right." *Paul*, 424 U.S. at 710.

specific property right that can bring his Void for Vagueness, or lack of notice, claim within the ambit of the Due Process Clause.[16]

In support of his Void for Vagueness claim, M.B. alleges that his disciplinary record "will be released to any college to which [he] may apply,"[17] and that being "formally mark[ed] as a 'bully' [will] jeopardize[e] his ability to obtain admission to the college of his choice." (Compl. ¶¶ 42, 45.) M.B. argues that "[b]y formally sanctioning M.B., imposing school discipline[,] and inaccurately labeling him a 'bully,' Defendants have jeopardized M.B.'s post-high school future and his ability to obtain admission to the college of his choice. These are cognizable liberty interests protected by the Due Process Clause." (Pl.'s Resp. 10.) The Court does not agree.

### a.      No State Law Exists to Undergird a Right to Higher Education

To articulate a cognizable liberty interest protected by the Due Process Clause, M.B. must allege *both* a stigmatic statement *and* a distinct alteration or eradication of some legal status. M.B. argues that binding precedent establishes "'that there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either "liberty" or "property" as meant in the Due Process Clause.'" (Pl.'s Resp. 11 (quoting *Paul*, 424

---

[16] Although M.B. states that Defendants' actions "distinctly alter[ed] his legal status," this statement amounts to "labels and conclusions" and constitutes a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Mere conclusions of law are not entitled to the assumption of truth, even at the motion to dismiss stage. *See Iqbal*, 556 U.S. at 679. The Court must evaluate whether the *facts* M.B. plausibly alleges establish the alteration of a legal status or deprivation of a specific property right. They do not.

[17] As noted earlier, the parties dispute the veracity of this allegation. At this procedural stage, however, the Court must, and does, presume that disclosure of M.B.'s disciplinary record to colleges occurred. The parties have procedural resources to address this dispute. If M.B. wishes to amend his Complaint, he may seek leave to do so. If Defendants wish to challenge M.B.'s factual assertions, they may do so in a motion for summary judgment or at trial.

20

U.S. at 710).)  The very next sentence of *Paul*, however, identifies those interests as ones that "attain this constitutional status by virtue of the fact that they have been *initially recognized and protected by state law*" because the Supreme Court has "repeatedly ruled that the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status." *Paul*, 424 U.S. at 710.  *Paul* also identifies "other interests, . . . protected not by virtue of their recognition by state law of a particular State but because they are guaranteed in one of the provisions of the Bill of Rights which has been 'incorporated' into the Fourteenth Amendment." *Id.* n.5.  "[J]eopardiz[ing] M.B.'s post-high school future and his ability to obtain admission to the college of his choice," (Pl.'s Resp. 10), simply does not rise to the level of a deprivation of either type of interest.

First, M.B.'s ability to obtain admission to the college of his choice is not a right that has been "initially recognized and protected by state law" and has thus "attain[ed] . . . constitutional status." *Paul*, 424 U.S. at 710.  Although the Supreme Court and the United States Court of Appeals for the Fourth Circuit have not decided the issue, persuasive and thoughtful decisions in federal courts in Virginia and this District have concluded since 2005—uniformly—that a student has no property interest in higher education because "there is no statutory right to be a public [or private] college or university student." *Alger*, 175 F. Supp. at 660 (Dillon, J.);[18] *see*

---

[18] In 2016, the *Alger* court held that a university student, suspended for five and a half years for a conviction for "sexual misconduct," failed to show that the university deprived him of a constitutionally protected liberty interest. *Alger*, 175 F. Supp. at 660.  "Although the action may have affected his private employment prospects and could impair his future employment opportunities, there was no change in his legal status," and he thus could not meet the "stigma-plus" standard of *Paul*. *Id.* at 661.

At the same time, without holding that Doe had actually stated a property interest, the *Alger* court allowed Doe to try to prove the legitimacy of his claim to a property right for continuing enrollment.  Doe alleged that James Madison University ("JMU") had "substantially limited its ability to suspend, expel or dismiss" students by adopting a series of "policies and procedures" which, in effect, resulted in a regular and routine system whereby students at JMU

*also McCoy v. E. Va. Med. Sch.*, No. 2:11cv494, 2012 WL 662529, at *2 (E.D. Va. Feb. 28, 2012) (Allen, J.) ("[A] student does not have a protected property interest in continuing education.");[19] *Kelley v. Univ. of Richmond*, No. 3:06cv203, 2006 WL 1555933, at *2 (E.D. Va. June 2, 2006) (Spencer, J.) ("[A] private education at [University of Richmond] is not a protected property interest.").[20]

Further, absent some underlying state-created interest, courts consistently decline to find a property interest in *continued* enrollment in college or graduate school programs when a student involuntarily separates from an academic institution. *See Abbas v. Woleben*, No. 3:13cv147, 2013 WL 5295672, at *6 (E.D. Va. Sept. 19, 2013) (Gibney, J.) ("Recent decisions in this Court have held conclusively that a student does not have a property interest in continuing enrollment in an educational program.");[21] *Nofsinger v. Va. Commonwealth Univ.*, No. 3:12cv236, 2012 WL 2878608, at *6 (E.D. Va. July 13, 2012) (Spencer, J.) ("[Plaintiff's] pleadings fails to identify a protected property interest . . . [because she fails to] point to some

---

were suspended, expelled, or dismissed only for cause. *Id.* at 657. The *Alger* court acknowledged the novelty of such a claim, should it eventually be allowed to proceed. Clearly, the *Alger* theory of establishing expectations to process cannot take hold in M.B.'s case.

[19] The *McCoy* court found in 2012 that a medical school student, dismissed because he failed to meet the school's academic requirements, could not state a claim that the school violated his substantive due process rights because the student had no protected property interest in continuing enrollment. 2012 WL 662529, at *2–3.

[20] In 2006, the *Kelley* court concluded that a university student, dismissed from a private university for non-payment of tuition, could not state a claim that the school violated her due process rights in part because the student had no protected property interest in a private university education. WL 1555933, at *2.

[21] The *Abbas* court ruled in 2013 that a medical school student, dismissed because he failed to take the required licensing examination, could not state a claim that the school violated his due process rights because the student alleged no deprivation of a liberty interest, and the student had no property right in continuing education. 2013 WL 5295672, at *6.

Virginia statute or rule showing that she has a 'legitimate claim of entitlement' to her continued enrollment in the graduate school program.");[22] *Davis v. George Mason Univ.*, 395 F. Supp. 2d 331, 335–36 (E.D. Va. 2005) (Lee, J.) ("[Plaintiff] has no property interest in continued enrollment in [the University] to support a claim for violation of Fifth Amendment procedural or substantive due process.").[23]

### b.  More Recent Virginia Federal Decisions Do Not Support M.B.'s Theory of Constitutional Injury

M.B. appears to rely on a 2016 case from this District that adds a novel voice, as did the *Alger* case from the Western District the same year, regarding what might establish a constitutionally protected interest for due process purposes.  M.B. cites *Doe v. Rector and Visitors of George Mason University* ("*GMU*") for the proposition that "an individual's interest in his future educational and employment prospects is a liberty interest."  (Pl.'s Resp. 12 (citing *GMU*, 149 F. Supp. 3d 602, 613–14 (E.D. Va. 2016) (Ellis, J.)).  The Court will assess M.B.'s argument below.

---

[22] The 2012 *Nofsinger* decision held that a graduate student in a physical therapy program, dismissed from the program because she had failed necessary clinical courses, could not state a claim that the school violated her due process rights in part because she could point to no "Virginia statute or rule showing that she has a 'legitimate claim of entitlement' to her continued enrollment in the graduate program," and thus failed to establish a protected property interest. *Nofsinger*, 2012 WL 2878608, at *6.

[23] As early as 2005, the *Davis* court recognized that a student enrolled in a Master's degree program student, dismissed because he received two failing grades in required courses, which constituted grounds for dismissal from the program, could not state a claim that the school violated his procedural or substantive due process rights because, "under Virginia law, there is no property interest in continued enrollment at a public university." *Davis*, 395 F. Supp. 2d at 333.

First, however, it bears noting that both *Alger* and *GMU* are inapposite to M.B.'s case

factually.[24]  Each involves an expulsion or multi-year suspension. *GMU*, 149 F. Supp. 3d at 608;

*Alger*, 175 F. Supp. 3d at 648.  M.B. received no suspension at all.  Each entailed a finding of the

serious charge of sexual misconduct. *GMU*, 149 F. Supp. 3d at 608; *Alger*, 175 F. Supp. 3d at

648.  M.B. was disciplined for bullying.  And each case involved proceedings during which

evidence was presented that the charged student did not see or have an opportunity to respond to.

*GMU*, 149 F. Supp. 3d at 612; *Alger*, 175 F. Supp. 3d at 653.  M.B. does not claim that MWGS

denied him access to the information used against him.

In *GMU*, the district court found that a public university violated a college student's due

process rights when it expelled him without a proper hearing or review.  149 F. Supp. 3d

at 613–14.  Although the *GMU* decision focuses on the dramatic injury a charge of sexual

misconduct would have on a student's reputation, the court explicitly noted that "plaintiff's

expulsion constitutes an alteration of his legal status as a student." *Id.* at 613.  The *GMU* court

concluded that Doe's expulsion from GMU, coupled with the damage to his reputation for

having been dismissed for sexual misconduct, established the foundational elements of a

protected liberty interest because the "'reputational injury [was] accompanied by a state action

that "distinctly alter[ed] or extinguishe[d]" a legal status.'" *Id.* (quoting *Shirvinksi*, 673 F.3d

---

[24] The *GMU* holding self-identified as narrow and fact-bound. *See* 149 F. Supp. 3d at 622 ("The narrowness of the conclusion here warrants emphasis."); *id.* at 623 ("[T]he procedural violation here was the compounding of the absence of specific notice as to the full scope of the events in issue, the clear deviation from established policies, the failure to provide adequate assurances of proper decision-making on appeal, and the absence of a final decision that permits meaningful review.").

at 315).  In so finding, the *GMU* court faced "appellate" procedural abnormalities so apparent
that the court found procedural due process violations without hesitation.[25]

　　This Court does not necessarily disagree with the sentiment expressed in *GMU* that "[i]n
the context of academic discipline, the possibility that a disciplinary violation will 'interfere with
later opportunities for higher education and employment' is so clear as to almost be a truism."
*Id.* at 614 n.9 (quoting *Goss*, 419 U.S. at 575).  However, the upshot of M.B.'s demarcation as a
"bully" in a secondary school record differs materially from the consequences before the court in
*GMU*.  The *GMU* court observed that the student's "transcript bears a notation that he was the
subject of a non-academic expulsion," which "any reasonable person will conclude . . . implies
'the existence of serious character defects.'"  *Id.* at 614 (quoting *Sciolino v. City of Newport
News*, 480 F.3d 642, 646 n.2 (4th Cir. 2007)).  This Court cannot rule, based on existing law or
these facts, that a finding of "bullying," the punishment of which involved a writing assignment
and no suspension, conveys the administrative finding of a serious character defect that has led
courts such as *GMU* or *Alger* to suggest that constitutional claims might be at issue.  *See also
Sciolino*, 480 F.3d at 646 n.2[26] ("We have noted that charges of . . . violations that smack of

---

[25] *Alger*, discussed above, allowed a novel procedural due process claim based on a
*property* deprivation to survive dismissal on a similarly extreme record.  In *Alger*, a JMU student
was suspended for over five years for sexual misconduct.  175 F. Supp. 3d at 648.  The *Alger*
court relied upon the reputational damage from a sexual misconduct record, the patent due
process violations in the appellate or review process, and the extreme penalty of a lengthy
suspension from school when giving the plaintiff a chance to develop his claim beyond the
motion to dismiss stage.  *Id.* at 657.

[26] In *Sciolino*, a probationary police officer challenged, under due process principles, his
termination from employment for advancing the odometer of his police cruiser so he could get a
new car.  The *Sciolino* court found that, even as a probationary employee, he had a right to a
name-clearing hearing and an opportunity to be heard so he could challenge the information in
his file that had been shared with prospective employers.
　　The *Alger* court hesitated to apply *Sciolino* and other public employment cases to the
liberty interest claim about college suspension before that court.  *Alger*, 175 F. Supp. 3d

deliberate fraud and in effect allege dishonesty . . . [can] give rise to a constitutional claim." (internal quotation marks omitted)).

Moreover, granting plaintiff summary judgment on his claim for a deprivation of his liberty interests, the *GMU* court noted that "if plaintiff seeks education or employment with institutions or organizations that require disclosure of [plaintiff's disciplinary] records, plaintiff's *only options* are to forgo opportunities with those institutions or organizations or to authorize the dissemination of records that *would likely foreclose plaintiff's ability to pursue such opportunities* because of the allegedly defamatory nature of the records." *GMU*, 149 F. Supp. 3d at 614 n.9 (emphases added). M.B. does not allege that his opportunity to attend college will be *foreclosed* as a result of Defendants' actions, merely that his "ability to obtain admission to the college of his choice" will be jeopardized. (Compl. ¶ 45.)

For all these reasons, even taking all of M.B.'s allegations as true, M.B. cannot state a claim for a deprivation of his liberty interests.

### c.   No Right to Higher Education, Especially at the College of One's Choice, Emanates from the Fourteenth Amendment

In addition to not being protected by state law, M.B.'s ability to obtain admission to the college of his choice also is not a right that has been "guaranteed in one of the provisions of the

---

at 660 n.8. This Court also will not extend the liberty interest doctrine beyond current bounds. This case, involving a secondary school non-suspension, is particularly unsuitable for such a reach.

First, unlike M.B., who lacks a protected interest in going to the college of his choice, government employees often have a protected interest in continued employment. Second, a different, four-part test applies when former public employees challenge whether damaging information can be shared with prospective employers. To establish their liberty interest claim, dismissed public employees must allege that the charges in their files post-termination: (1) place a stigma on their reputation; (2) were made public by the employer; (3) were made in conjunction with termination or demotion; and, (4) were false. *Sciolino*, 480 F.3d at 646. Applying this four-part test to the facts of M.B.'s case would amount to placing a square block in a round hole. This inevitable exercise in frustration may explain why the Fourth Circuit has cautioned against applying public employment cases to circumstances in which they are not "germane." *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 315 (4th Cir. 2012).

Bill of Rights which has been 'incorporated' into the Fourteenth Amendment." *Paul*, 424 U.S. at

710 n.5. "Public education is not a 'right' granted to individuals by the Constitution." *Plyler v.*

*Doe*, 457 U.S. 202, 221 (1982) (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1,

35, (1973)). Although "education is perhaps the most important function of state and local

governments," *Brown v. Bd. of Ed. of Topeka*, 347 U.S. 483, 493 (1954), and "[t]he American

people have always regarded education and the acquisition of knowledge as matters of supreme

importance," *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923), an individual has no

constitutionally-granted right to education. *See Rodriguez*, 411 U.S. at 35 ("Education, of

course, is not among the rights afforded explicit protection under our Federal Constitution. Nor

do we find any basis for saying it is implicitly so protected.").

Taking all of his well-pleaded allegations as true, M.B. has failed to plead facts sufficient

to satisfy the "stigma-plus" standard of *Paul v. Davis*.[27] Even assuming that M.B. pleads facts

showing that Defendants' actions damaged his reputation, he cannot show that Defendants'

disciplinary action altered his legal status or deprived him of a property right because "[t]here is

no statutory right to be a public [or private] college or university student," *Alger*, 175 F. Supp.

at 660; *Kelley*, 2006 WL 1555933, at *2, and "[p]ublic education is not a 'right' granted to

individuals by the Constitution," *Plyler*, 457 U.S. at 221 (1982) (citing *Rodriguez*, 411 U.S.

---

[27] Indeed, were the Court to find that Defendants deprived M.B. of a constitutionally protected interest for disciplinary actions that "jeopardized M.B.'s post-high school future and his ability to obtain admission to the college of his choice," (Pl.'s Resp. 10), it would be "hard to perceive any logical stopping place to such a line of reasoning." *Paul*, 424 U.S at 698–99. Such a finding might cripple school administrators' ability to sanction students for disciplinary violations, and it might inadvertently invite an influx of lawsuits alleging constitutional deprivations from routine school discipline. "[I]t is not the duty of the federal courts to relitigate the evidentiary issues arising out of school disciplinary proceedings," *Kirtley v. Armentrout*, 405 F. Supp. 575, 578 (W.D. Va. 1975) (citing *Wood v. Strickland*, 420 U.S. 308, 326 (1975)). The Court declines to find that ordinary disciplinary decisions by high school officials implicate the Due Process Clause of the United States Constitution.

at 35). M.B. therefore fails to allege that Defendants deprived him of a constitutionally protected

liberty interest. *See Paul*, 424 U.S. 708–09. Because M.B. also fails to allege the deprivation of

a property interest, he cannot state a claim for denial of his due process rights, and Count I, the

Void for Vagueness claim, must fail. *See Stone*, 855 F.2d at 172.

### B.    M.B. Cannot State a Claim That Defendants Violated His Substantive Due Process Rights[28]

The Court will grant Defendants' Motion to Dismiss Count II, M.B.'s Arbitrary and

Capricious claim, because M.B. fails to allege the deprivation of a constitutionally protected

interest, and even if he had, the factual allegations in his Complaint repudiate his assertion that

Defendants' actions were arbitrary and capricious. "In the area of academics, substantive due

process protection shields individuals only from actions that are arbitrary and capricious." *Davis

v. George Mason Univ.*, 395 F. Supp. 2d 331, 336 (E.D. Va. 2005) (citing *Bd. of Curators of

Univ. of Mo. v. Horowitz*, 435 U.S. 78, 91–92 (1978)). "[T]he Court 'may not override [an

academic decision] . . . unless it is such a substantial departure from accepted academic norms as

to demonstrate that the person or committee responsible did not actually exercise professional

judgment." *Lewin*, 910 F. Supp. at 1167 (second alteration in original) (citing *Ewing*, 474 U.S.

at 225). To state a substantive due process claim, a plaintiff must first show that he or she had "a

constitutionally protected liberty or property interest." *Stone*, 855 F.2d at172 (citing *Roth*, 408

U.S. 564).

---

[28] M.B. entitles Count II only as "Due Process—Arbitrary and Capricious Action."
(Compl. at 9.) He then asserts that Defendants deprived him of "liberty without due process of
law, in violation of the Fourteenth Amendment" through their arbitrary and capricious actions.
(*Id.* ¶ 51.) The Court interprets this claim as one for a violation of M.B.'s substantive due
process rights under the Fourteenth Amendment. *See Davis*, 395 F. Supp. 2d at 336 ("In the area
of academics, substantive due process protection shields individuals only from actions that are
arbitrary and capricious." (citing *Horowitz*, 435 U.S. at 91–92)).
    The Court therefore analyzes M.B.'s substantive due process rights with the "caution and
restraint" that the Supreme Court has instructed courts to use. *Ewing*, 474 U.S. at 229
(Powell, J., concurring) (citing *Moore v. E. Cleveland*, 431 U.S. 494, 502 (1977)).

As discussed above, taking all of M.B.'s factual assertions as true, he fails to allege a deprivation of any constitutionally protected property or liberty interest. Even if M.B. had suffered a deprivation of a constitutionally protected interest, the Court cannot find that Defendants' disciplinary decisions amount to such a substantial departure from academic norms as to demonstrate that Defendants exercised no professional judgment. *See Lewin*, 910 F. Supp. at 1167. As alleged, Defendants initiated disciplinary action against M.B. by speaking privately with M.B. and his parents. Seventeen days later, McGee informed M.B. and M.B.'s parents via letter that MWGS had found M.B. in violation of the prohibition of bullying, citing the MWGS policy that M.B. had violated and explaining which of M.B.'s actions constituted the violation. Forty-two days after that, M.B. was granted an appeal hearing during which M.B. presented his perspective and defended his actions. M.B.'s Complaint thus alleges facts indicating that Defendants' disciplinary decision resulted from deliberation and the exercise of professional judgment. *See id.* ("Nothing among Plaintiff's allegations suggests that the review of Plaintiff's . . . record by the Committee and the two officials was anything but careful and deliberate."). The Court cannot find that Defendants' decision to discipline M.B. for bullying constituted "arbitrary and capricious" action in violation of the Due Process Clause. *See Davis*, 395 F. Supp. 2d at 336. The Court will grant Defendants' Motion to Dismiss Count II, the Arbitrary and Capricious claim.

### IV.  M.B. Pleads Facts That, if True, Could Establish a First Amendment Violation

The Court must deny Defendants' Motion to Dismiss Count III, the First Amendment claim. At the motion to dismiss stage, the Court is bound by M.B.'s allegations, which include no facts that demonstrate a substantial disruption of the work and discipline of the school, or any reason for Defendants to forecast such a disruption. Taking M.B.'s well-pleaded factual

allegations as true, the Court cannot find, at this stage, that Defendants were entitled to regulate his off-campus speech.

### A.    Legal Standard

The Constitution provides that Congress and, through the Fourteenth Amendment, the states may not "abridg[e] the freedom of speech." U.S. Const. amend. I; *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 434 (4th Cir. 2013). Although "the constitutional rights of students in public schools are not automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986), students do not "shed their constitutional rights to freedom of speech . . . at the schoolhouse gate," *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 506 (1969).

The Supreme Court established the basic framework governing student speech in *Tinker*. 393 U.S. 503. In *Tinker*, a group of students wore black armbands to school to protest the Vietnam War, and were suspended until they returned without armbands. *Id.* at 504. Finding that wearing the armbands constituted symbolic speech, the Supreme Court held that schools may regulate student speech, "in class or out of it[] which . . . materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Id.* at 513. However, a student may "express his [or her] opinions, even on controversial subjects . . . , if he [or she] does so without 'materially and substantially interfering with the requirements of appropriate discipline in the operation of the school' and without collid[ing] with the rights of others." *Id.* (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)) (last alteration in original). And although school officials may even impose *prior* restraints on student speech if the officials "reasonably . . . forecast substantial disruption of or material interference with school activities," *id.* at 514; *see also Hardwick*, 711 F.3d at 434, school officials may not regulate student speech based only on

30

"undifferentiated fear or apprehension of disturbance," *Tinker*, 393 U.S. at 508. Finding that the students' behavior in *Tinker* "neither interrupted school activities nor sought to intrude in the school affairs or the lives of others," and merely caused "discussion outside of the classrooms, but no interference with work and no disorder," the Supreme Court held that the school officials had unconstitutionally regulated the students' symbolic speech. *Id.* at 514.

Since deciding *Tinker*, the Supreme Court has identified three exceptions[29] under which school officials may regulate student speech even when that speech does not 'materially and substantially interfer[e] with the requirements of appropriate discipline in the operation of the school' [or] collid[e] with the rights of others," or when the school officials do not "reasonably . . . forecast" such a disruption. *Id.* at 513, 514. The Fourth Circuit has held that, unless one of

---

[29] Generally speaking, the first exception covers vulgar or lewd speech. As part of their role in "teaching students the boundaries of socially appropriate behavior," school officials may regulate "vulgar and offensive spoken language" or "plainly offensive" speech that occurs on school grounds. *Fraser*, 478 U.S. at 681, 684, 683. M.B.'s email contained no "plainly offensive" speech, and likely did not occur on school grounds. *Contra Fraser*, 478 U.S. 675.

The second exception applies to speech, such as that in a student newspaper, which may convey that it was school-sanctioned. Distinguishing between speech that a school *tolerates* and speech that a school *affirmatively promotes*, the Supreme Court held that school officials may exercise greater control over "expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school [and] may fairly be characterized as part of the school curriculum." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988). Without running afoul of the Constitution, school officials may "exercise[e] editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273. M.B.'s email could not be "reasonably perceive[d] . . . [as] bear[ing] the imprimatur of the school," nor could it "fairly be characterized as part of the school curriculum." *Contra Kuhlmeier*, 484 U.S. 260.

Finally, consistent with their job of "educating students about the dangers of illegal drug use," school officials may "restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." *Morse v. Frederick*, 551 U.S. 393, 408, 402. Of course, nothing about M.B.'s email could be "reasonably viewed as promoting illegal drug use." *Contra Morse*, 551 U.S. 393.

Because M.B.'s email fits none of the three exceptions, the *Tinker* substantial-disruption test governs. Therefore, in order to punish M.B. for sending the email, the Defendants must have reasonably foreseen that M.B.'s speech would "'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.'" *Tinker*, 393 U.S. at 509.

31

the three exceptions applies, the *Tinker* "substantial-disruption test" governs school officials'

regulation of student speech. *Hardwick*, 711 F.3d at 435 n.11 ("While the Supreme Court is free

to create exceptions to or even abandon *Tinker*'s substantial-disruption test, we must continue to

adhere to the *Tinker* test in cases that do not fall within any exceptions that the Supreme Court

has created until the Court directs otherwise."). M.B. does not allege any facts falling under one

of the three *Tinker* exceptions, so the Court must evaluate Count III, his First Amendment claim,

under *Tinker*'s substantial disruption test.

Whether the speech occurs on or off the school campus must be weighed. Although the

Supreme Court has not specifically addressed school officials' regulation of off-campus student

speech, the Fourth Circuit has held that, in keeping with their "role as the trustees of the student

body's well-being," school officials may regulate student speech that originates off-campus

when a sufficiently strong nexus exists between the student speech and the school's pedagogical

interests. *Kowalski v. Berkeley Cty. Schs.*, 652 F.3d 565, 573 (4th Cir. 2011) (holding that school

officials did not violate a student's First Amendment rights when they suspended her for

creating, posting to, and inviting approximately one hundred classmates to join, a social

networking webpage that ridiculed a fellow classmate). Thus, school officials may discipline

students for speech, regardless of where the speech originates, when the speech is "materially

and substantially disruptive in that it 'interfere[s] . . . with the school's work [and] collide[s] with

the rights of other students to be secure and to be let alone.'" *Id.* at 573–74 (second and third

alterations in original) (quoting *Tinker*, 393 U.S. at 508, 513); *accord Hardwick*, 711 F.3d at 436

(upholding school decision to prohibit the Confederate flag at school because past racially

charged incidents made a substantial disruption reasonably foreseeable). In order to comply with

*Tinker*, however, a school official may regulate off-campus student speech only when it is

32

reasonably foreseeable that the speech would "make its way to the school in a meaningful way" and "interfere[] with the work and discipline of the school." *Kowalski*, 652 F.3d at 574; *accord Doninger v. Niehoff*, 527 F.3d 41, 51 (2d Cir. 2008) (upholding school decision to punish student for off-campus speech when the student, in her blog, encouraged others to contact the administration to "piss [them] off more").

### B.    M.B.'s Claim That Defendants Violated His First Amendment Rights Survives the Motion to Dismiss

M.B.'s Count III, the First Amendment claim, survives the Motion to Dismiss because his Complaint includes only scant facts regarding how his email and its aftermath affected the MWGS community.  To grant Defendants' Motion to Dismiss, the Court would have to find that M.B.'s actions *substantially* disrupted the work and discipline of MWGS or collided with the rights of the other students, or that the Defendants could reasonably forecast a substantial disruption.  Given the facts as M.B. has alleged them, the Court cannot so find.

The Defendants assert in their Motion to Dismiss that "it was reasonably foreseeable that [M.B.'s] email would reach the school and his email threatened to—and did—cause a material and substantial disruption to the operation of [MWGS] and collided with the rights of others." (Mot. Dismiss 10–11.)  Analogizing M.B.'s private email to the Harvard Admission's Office to Kowalski's public webpage, created for the purpose of ridiculing a fellow classmate and shared with approximately one hundred people, the Defendants argue that M.B. could foresee that his speech would reach MWGS and create a substantial disruption.  This is so, they say, because M.B. included McGee's and Tharp's email addresses in his email, and because it was "targeted and defamatory and aimed at a fellow classmate." (*Id.* at 12.)  The Defendants contend entitlement to sanction M.B. for his speech because "speech that is defamatory of another student

or that constitutes harassment or bullying of a student can be particularly disruptive to the school environment." (*Id.* at 11.)

In support of their contention, Defendants point to language in *Kowalski* that "the language of *Tinker* supports the conclusion that public schools have a 'compelling interest' in regulating speech that interferes with or disrupts the work and discipline of the school, including discipline for student harassment and bullying." *Kowalski*, 652 F.3d at 572 (citing *DeJohn v. Temple Univ.,* 537 F.3d 301, 319–20 (3d Cir. 2008)). Defendants contend that M.B.'s speech, "like the speech at issue in *Kowalski*, . . . was targeted and defamatory and aimed at a fellow classmate." (Mem. Supp. 12.) In *Kowalski,* the school permissibly regulated the student's off-campus speech, because, like here, Defendants argue, "had the school not intervened, the potential for continuing and more serious harassment of [R.P.] as well as other students was real." *Kowalski*, 652 F.3d at 574. "Experience suggests that unpunished misbehavior can have a snowballing effect, in some cases resulting in 'copycat' efforts by other students or in retaliation for the initial harassment." *Id.* Thus, Defendants assert that they constitutionally could intervene to prevent the "threatened . . . material[] and substantial[] interfer[ence] with the requirements of appropriate discipline" that could have resulted from additional similar emails—from M.B. or other students. (Mem. Supp. 12); *see also id.* at n.6 ("If [M.B.] had not been disciplined for his false email to Harvard, what was to stop [him] from sending similar, false emails to the grantor of the scholarship and others?").

Given the facts M.B. alleges in his Complaint, the Court cannot find that the Defendants could reasonably foresee a *substantial* disruption to the school environment. While M.B. likely "could foresee that his speech would reach the school [because] in his email he urged the Harvard admission officers to contact both McGee and Tharp," (Mem. Supp. 12), it was not

34

necessarily reasonably foreseeable to the school officials that his email would "impact the school environment," as described in First Amendment cases. *See Kowalski*, 652 F.3d at 573. M.B. alleges that he sent the email directly to the Harvard Admission's Office, and did not "share the email with any other student" or "use any form of social media to advertise or announce his concerns." (Compl. ¶ 24.) This means of communication, unlike a blog or website, makes it less reasonably foreseeable that M.B.'s actions would create a substantial disruption within the school environment. *Contra Kowalski*, 652 F.3d at 573. Finally, aside from stray comments about an undated student outcry regarding the "cheating incident" and the suspension of the Honor Council, M.B.'s Complaint contains no facts indicating that his email affected the school environment at all, much less that the email substantially disrupted that environment.[30] *See Tinker*, 393 U.S. at 514 (finding no substantial disruption when the student speech at issue "caused discussion outside of the classrooms, but no interference with work and no disorder").

The Court does not disagree that M.B.'s actions, even as alleged in his Complaint and viewed in the light most favorable to M.B., had great potential to negatively impact R.P. and R.P.'s future. And the Court cannot conclude alongside M.B. "that he was bound . . . by his school's Honor Code" to report to the Harvard Admission's office his "aware[ness] that [R.P] had been caught and disciplined for cheating while at [MWGS]." (Compl. ¶ 20.)[31] However, as

---

[30] M.B's reference to the "student outcry about the administration's handling of the cheating incident," (Compl. at 6 n.3), may suggest the type of substantial disruption *Tinker* envisions, but, reading the facts favorably to M.B. as it must, the Court cannot infer that any outcry or disruption flowed from M.B.'s speech and not some other incident.

[31] The Honor Code "delegates to the individual students responsibility for integrity in their academic behavior." (Student Handbook 18.) MWGS "students do not lie, cheat, or commit plagiarism, nor tolerate those who do." (*Id.* at 17.) Students are responsible to "[r]eport any violations of the Honor Code. If a student witnesses or realizes that a violation of the Honor Code has occurred, the student must report the offense *to the instructor involved*." (*Id.* at 18 (emphasis added).)

alleged, M.B.'s conduct does not mirror Kowalski's because the Complaint asserts that only one student learned of the email, and it lacks any other indication of disruption to the school environment. Nor does M.B.'s conduct match Doninger's, a student who created a blog using vulgar language urging students contact school administrators and complain about the cancellation of a "jamfest" in order to "piss them off," resulting in numerous calls and a threatened sit-in. *Doninger v. Niehoff*, 527 F.3d 41, 51 (2d Cir. 2008). That said, both *Kowalski* and *Doninger* contained much more evidence than the Court has before it of disruption to the school environment.[32]

At this stage, when the Court must take the facts alleged in M.B.'s Complaint as true, Defendants can make no showing of substantial disruption, nor can they establish that they could reasonably forecast a substantial disruption because, as alleged, M.B. never shared the email with other students or otherwise broadcast his opinion. (Compl. ¶ 24.) M.B.'s Complaint contains no facts indicating that it was reasonably foreseeable that the email he sent to the Harvard Admission's Office would "make its way to the school in a meaningful way" and "interfere[] with the work and discipline of the school." *Kowalski*, 652 F.3d at 574. Taking all of M.B.'s well-pleaded allegations as true and viewing them in the light most favorable to M.B., M.B. pleads facts sufficient to state a claim for a violation of his First Amendment rights that is "plausible on its face" sufficient to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678–79

---

The Court finds nothing in the language of the Honor Code that requires M.B. to report a fellow student's suspected cheating to the admissions office of the university to which that student had been admitted.

[32] In *Kowalski*, the Fourth Circuit reviewed a district court's grant of summary judgment in favor of defendants, 652 F.3d at 567, and in *Doninger*, the United States Court of Appeals for the Second Circuit was reviewed a district court's denial of a motion for preliminary injunction, 527 F.3d at 43. At this stage, the Court is bound to accept and view in the light most favorable to M.B. all of his well-pleaded factual allegations.

(citing *Twombly*, 550 U.S. at 570; Fed. R. Civ. P. 8(a)(2)).   Defendants' Motion to Dismiss Count III, the First Amendment claim, will be denied.

### V.  Conclusion

For the foregoing reasons, the Court will grant in part and deny in part Defendants' Motion to Dismiss.  (ECF No. 4.)  The Court will dismiss Count I, the Void for Vagueness claim, and Count II, the Arbitrary and Capricious claim.  Count III, the First Amendment claim, remains.

/s/

M. Hannah Lauck
United States District Judge

Date: 3/24/17
Richmond, Virginia